# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JASON THOMAS MCALLISTER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 5:13-940 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Jason Thomas McAllister ("McAllister") seeks review of a decision denying his application for Social Security disability insurance benefits.

## I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can they overturn administrative rulings because they would have reached different conclusions had the matters come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

## II.  Background

McAllister applied for disability insurance benefits, alleging that as of June 1, 2010, he became unable to work due to "back injury, depression, anxiety, [and] knee injury." (T. 169).[1] Administrative law judge, Scott M. Staller ("ALJ Staller"), conducted an evidentiary hearing. (T. 16-44). McAllister, represented by legal counsel, attended and testified, as did an impartial vocational expert, Esperanza DiStefano, M.S., C.R.C.

ALJ Staller denied McAllister's application in a written decision dated February 14, 2012. (T. 60-69). The Appeals Council denied McAllister's request for review (T. 1-6). McAllister then instituted this proceeding.

## III.  Commissioner's Decision[2]

ALJ Staller found that McAllister suffers from several severe impairments consisting of "degenerative disc disease of the lumbar spine; right knee pain; a mood disorder; and a depressive disorder." (T. 62). He further found that these impairments diminish McAllister's ability to engage in work-related activities such that his current residual functional capacity is for work only at

---

[1]    "T." followed by a number refers to the page of the administrative record. (Dkt. No. 8).

[2]    ALJ Staller utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. The Commissioner's five-step process is described fully in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

the light exertional level, further reduced by numerous postural and mental limitations.[3] (T. 63-64).

VE DiStefano testified that a person with such diminished capacity cannot perform McAllister's past relevant work as a landscape foremen, laborer–landscape, concrete mason, form carpenter, forklift operator and machine operator because these positions require medium exertional capacity or greater. (T. 38, 67). VE DiStefano opined, however, that other available jobs exist that such a person can perform. (T. 38). He identified representative occupations of "bench assembler" (light/unskilled), mail clerk (light/unskilled), and office helper (light/unskilled). (T. 38, 68).

Based on VE DiStefano's testimony, ALJ Staller concluded that a finding of "not disabled" was appropriate under the "framework" of Medical-Vocational Rule 202.21.[4] (T. 68). McAllister's application, therefore, was denied. (*Id.*).

---

[3]    ALJ Staller's full residual functional capacity finding was:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. The claimant can stand and/or walk for at least 2 hours in an 8-hour day and sit for about 6 hours in an 8-hour day. The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl. The claimant must avoid concentrated exposure to dangerous moving machinery and unprotected heights. The claimant is able to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions. The claimant can interact appropriately with supervisors and workers in a routine work setting. The claimant can maintain attention and concentration for 2-hour segments over an 8-hour period and complete a normal workweek without excessive interruption from psychologically or physically based symptoms.

(T. 63-64).

[4]    *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Medical-Vocational Guidelines are a matrix of general findings – established by rule – as to whether work exists in the national economy that a person can perform. They "take into account a claimant's residual functional capacity, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (summary order) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).

## IV. Points of Alleged Error

McAllister's brief presents three points of error, as follows:

1. The ALJ erred by according inadequate weight to Plaintiff's treating physician Dr. Tiso's opinion as to Plaintiff's physical limitations, and improperly relied upon the outdated and vague opinion from consultative examiner Dr. Shirley-Williams;

2. The ALJ's credibility findings are unsupported by substantial evidence because the ALJ erred in analyzing the required factors when assessing Plaintiff's credibility; and

3. The ALJ's Step 5 determination is unsupported by substantial evidence because the ALJ relied upon an incomplete hypothetical question asked to the vocational expert.

(Dkt. No. 10, p. 1).

## V. Residual Functional Capacity

The first two points of error ultimately attack ALJ Staller's finding of McAllister's residual functional capacity. Both points argue that ALJ Staller employed legally-incorrect techniques when weighing credibility of medical source opinions regarding nature and severity of McAllister's lumbar impairments (Point 1) and McAllister's subjective testimony regarding intensity, persistence and limiting effects of his symptoms (Point 2).

### A. *Determining Residual Functional Capacity*[5]

Before considering whether severely impaired persons can perform their prior relevant work or alternative available work, administrative law judges assess and articulate their "residual functional capacity." This term of art refers

---

[5] McAllister alleged disability due to physical (back and knee) and mental (depression and anxiety) impairments. ALJ Staller addressed residual functional capacity in terms of both mental and physical abilities. McAllister does not challenge ALJ Staller's assessment of his mental residual functional capacity, nor does he challenge ALJ Staller's assessment as it relates to his knee injury. Accordingly, this section deals only with residual functional capacity related to McAllister's lumbar impairment.

to what claimants can still do in work settings despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545. Administrative law judges thus decide whether applicants, notwithstanding their severe impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996). When assessing residual functional capacity, an administrative law judge must consider "all of the relevant medical and other evidence." *See* 20 C.F.R. § 404.1545(a)(3).

1.   <u>Medical Opinion</u>

In most cases, administrative law judges rely principally on professional medical opinion as to an impaired individual's abilities to engage in sustained work activities. When evaluating such evidence, administrative law judges must give controlling weight to opinions of treating sources regarding the nature and severity of impairments, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. *See* 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96–2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *1–2 (SSA July 2, 1996).

When controlling weight is not afforded, administrative judges consider certain regulatory factors to determine *how much weight*, if any, to give such opinions: (1) length of treatment relationship and the frequency of examination; (2) nature and extent of treatment relationship; (3) evidence that supports a treating physician's report; (4) how consistent a treating physician's opinion is

with the record as a whole; (5) specialization of a physician in contrast to condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(1)-(6). Generally, more weight is given to the opinion of a source who has treated the claimant than to the opinion of a source who has not. 20 C.F.R. § 404.1527(c)(1). The Commissioner's regulation states:

> [W]e give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).

State agency medical consultants, however, are recognized experts in evaluation of medical issues in disability claims under the Act. *See* 20 C.F.R. §§ 404.1526(c), 404.1527(e)(2)(i). Accordingly, opinions of such consultants can be given weight, even greater weight than opinions of treating physicians when such opinions are supported by substantial evidence. *See, e.g., Netter v. Astrue*, 272 Fed. App'x 54, 55-56 (2d Cir. 2008) (summary order) (reports of consultative and/or non-examining physicians may override opinions of treating physicians, provided they are supported by substantial evidence in the record).

2.  Subjective Evidence

Claimants' testimony regarding persistence, intensity and limiting effects of their symptoms is not only relevant, but desirable. On the other hand, it is subjective and may be colored by interest in obtaining a favorable outcome. An administrative law judge, therefore, has a difficult task of deciding how much weight to give claimants' subjective self-evaluations.

The Commissioner provides explicit guidance. A formal regulation requires consideration of seven objective factors that naturally support or impugn subjective testimony of disabling pain and other symptoms.[6] An interpretive ruling directs administrative law judges to follow a two-step process to evaluate claimants' allegations of pain.[7] SSR 96–7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996). The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make

---

[6] An administrative law judge must evaluate a claimant's symptoms, including pain, based on medical and other evidence, including the following factors:

(i) claimant's daily activities;
(ii) location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii) precipitating and aggravating factors;
(iv) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v) treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi) measures claimant uses or has used to relieve pain or other symptoms; and
(vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c).

[7] The 2-step process is described as follows:

First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96–7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996).

a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

## B. Forensic Opinions Regarding McAllister's Limitations

The evidentiary record before ALJ Staller contained forensic opinions from two medical sources. A treating physician, Robert Tiso, M.D., a board-certified anesthesiologist with additional certification in pain management, submitted a "Medical Source Statement"[8] dated June 11, 2011. (T. 267-70). After summarizing various clinical findings underlying his diagnosis of herniated nucleus pulposus,[9] Dr. Tiso opined that McAllister's lumbar impairment causes the following limitations:

- he can walk only less than 1 block without rest or severe pain;
- he can sit for 10 minutes at one time and about 2 hours total in an 8-hour workday;
- he can stand for 10 minutes at one time and about 2 hours in an 8-hour workday;
- he needs a job that permits shifting positions at will from sitting, standing, or walking;
- he needs unscheduled breaks during the workday every 1.5 hours lasting 10 to 15 minutes in duration;
- he can rarely lift less than 10 pounds and never 10 pounds;
- he can rarely twist, stoop/bend, crouch/squat, or climb stairs;
- he can never climb ladders;
- he will be off-task 20 percent of the workday due to his impairments; and
- he will miss about 3 days per month due to his impairments or treatment.

(T. 267-70).

---

[8] Dr. Tiso's medical source statement is not an official form promulgated by the Social Security Administration. Its origination is not disclosed in the record. Dr. Tiso's medical source statement was prepared initially and co-signed by his Physician Assistant Anne Marie Arendt, RPA-C who works under Dr. Tiso's supervision.

[9] Dr. Tiso's clinical findings were that McAllister has neuroanatomic distribution of right sided pain with L5–S1 distribution. (T. 267). He has limitation of motion in his spine with flexion at 10 degrees and extension at 5 degrees. (*Id.*). He demonstrates sensory reflex lost in the patella and "achilles" on the right. (*Id.*). He has a positive straight leg raise test on the right both sitting and supine. (*Id.*, at 268).

The second medical source opinion was from Lisa Shirley-Williams, M.D., a consultative internal medicine specialist. Dr. Shirley-Williams conducted a physical evaluation of McAllister on October 29, 2010 (about 6 months earlier than Dr. Tiso's medical source statement).[10] In her "Internal Medicine Examination" report, Dr. Shirley-Williams opines that McAllister's prognosis is "stable," but he has "moderate limitations for bending, lifting, squatting, kneeling, and climbing." (T. 248). Dr. Shirley-Williams did not indicate that McAllister has any limitations in standing, walking, or sitting. (T. 65, 248).

C. *McAllister's Testimony*

McAllister testified that he stopped working in May 2010, because his back pain became too severe, and he could not do his normal duties. (T. 24). His back pain is "sharp, burning," constant and radiates down his right leg. (T. 25). He has difficulty bending over, and it takes him a minute to stand up. (T. 26). On a typical day, he gets his daughter ready for school and, thereafter, it depends on how he feels what he is able to do. (T. 27). If he is sore, he doesn't push himself. However, he stated "[i]f I feel okay or, you know, I'm not hurting as much I'll, I tend to push myself to the limit." (*Id.*). He cooks whatever he likes to eat. (T. 27-28). He dresses and bathes himself, but he sits to wash his feet and legs because bending causes too much pain. (T. 28). He does limited

---

[10]     Dr. Shirley-Williams's clinical findings were that McAllister appeared to be in no acute distress, walked favoring the left lower extremity and was observed to avoid bearing weight on the right lower extremity, walked on heels and toes without difficulty, squatted only about 25% of the way due to knee pain, had a normal stance, did not require assistance with changing for the exam or getting on and off the exam table, and was able to rise from the chair without difficulty. (T. 246). McAllister's cervical spine showed full flexion and extension, lateral flexion bilaterally, and full rotary movement bilaterally. (T. 247). His lumbar spine showed flexion, extension limited to 45 degrees. (*Id.*). McAllister had full range of motion of hips and ankles, bilaterally. (*Id.*). McAllister's upper and lower extremity strength was 5/5. (*Id.*).

housework in order to keep up with his daughter. (*Id.*). He is able to shop for groceries, but sometimes his trips are shortened due to pain. (*Id.*). Lifting a laundry basket full of clothes is difficult and uncomfortable. (T. 32). Everything takes him longer because he constantly has to stop and take breaks. (*Id.*). He has pain putting on socks and shoes. (T. 177). Additionally, after driving for 15 minutes, his back starts to hurt. (T. 35).

He takes various medications for back pain. (T. 28-29). They cause drowsiness, occasional dizziness, and heartburn. (T. 29). Muscle relaxers make him feel "zonked out," so he does not take more for fear of being unable wake up if his daughter needs him in the night. (T. 32). This causes him to wake up due to pain often in the middle of the night. (*Id.*).

## D. *ALJ Staller's Credibility Choices*

McAllister would not qualify for light work under limitations opined by Dr. Tiso or as urged by McAllister.[11] ALJ Staller, however, elected to give only "limited weight" to Dr. Tiso's opinions regarding McAllister's limitations. (T. 66). ALJ Staller acknowledged that Dr. Tiso was McAllisters's treating physician, but rejected his opinions as being inconsistent with the "objective medical evidence of record." *Id.* ALJ Staller cited one "example" of such inconsistency, *viz.*,

---

[11]     Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking ... or when it involves sitting most of the time with some pushing and pulling of arm or leg controls .... 20 C.F.R. § 404.1567(b).

     Dr. Tiso opined that McAllister could *rarely* lift or carry less than 10 pounds and *never* more than 10 pounds. (T. 269). Dr. Tiso also found McAllister could only sit/stand for 10 minutes at a time for a maximum of 2 hours in an eight-hour workday. (T. 268).

     McAllister testified that he cannot lift/carry more than 15 pounds comfortably. (T. 34). He further claimed that he cannot sit/stand more than 20 minutes without having to shift or move. (T. 33).

treatment notes indicating that medications help alleviate his radicular symptoms and low back pain. (T. 66-67). He also viewed McAllister's daily activities as indicating that McAllister's "low back pain does not limit . . . [him]. . . to the degree that Dr. Tiso indicates. . .." (T. 67).

ALJ Staller concluded that the medical evidence overall was "more consistent with Dr. Shirley-Williams's conclusions." (T. 67). As described earlier, Dr. Shirley-Williams reported that McAllister is only moderately limited with respect to bending, lifting, squatting, kneeling and climbing, and has no limitations for standing, walking and sitting. (*See* Section V.*B.*, *supra.*)

As for McAllister's self-evaluations, ALJ Staller found that McAllister's medically-determinable impairments reasonably can be expected to cause some of his alleged symptoms, but that his statements concerning intensity, persistence and limiting effects of those symptoms are not credible "to the extent they are inconsistent with the above residual functional capacity assessment." (T. 64). ALJ Staller cited McAllister's inconsistent testimony, treating doctors' recommendations for aerobic and treadmill exercise, Dr. Shirley-Williams's forensic opinions and various daily activities that ALJ Staller viewed as showing that McAllister's limitations "are not as severe as alleged."[12] (T. 65).

## E.   *McAllister's Challenges*

McAllister lodges several objections to ALJ Staller's weighting of the medical opinion evidence. First, McAllister argues that Dr. Tiso has a high degree of specialized expertise, and that his conclusions "were highly consistent

---

[12]     Daily activities listed by ALJ Staller were (1) ability to drive a vehicle at least 30 - 35 miles, (2) provide daily childcare, and (3) dress, bathe and prepare meals. (T. 65).

with the objective medical evidence." (Dkt. No. 10, p. 14, 20). McAllister's brief recites a litany of objective medical findings which McAllister proffers as corroborating Dr. Tiso's conclusions. Principal among these are two magnetic resonance imaging (MRI) tests performed in December, 2010, and again on June 12, 2011, that revealed multi-level disc herniations with accompanying stenosis and other sources of nerve impingement. (T. 313, 328).

Second, McAllister argues that the only medical opinion evidence ALJ Staller cited when discounting Dr. Tiso's opinions was Dr. Shirley-Williams's "vague and outdated" internal medicine examination report. (Dkt. No. 10, 14, 20-21). McAllister views Dr. Shirley-Williams's opinions as stale because they predate several objective diagnostic tests with positive results, including the two MRI examinations. (*Id.*, at 20-21). McAllister views those opinions as too vague because they express his limitations generally, *i.e.*, "moderate," without more specific references to capabilities for bending, lifting, squatting, etc. . (*Id.*).

McAllister argues that none of the remaining *medical* evidence that ALJ Staller cited when discounting Dr. Tiso's opinions contains medical opinion, diagnostic imaging or examination findings. Thus, the only other supposed inconsistencies were not in *objective* medical evidence, as stated, but rather ALJ Staller's own assessment of *subjective* evidence. In that regard, McAllister contends that ALJ Staller "cherry picked" the evidence, citing only evidence supporting his decision to discount Dr. Tiso's opinion while ignoring evidence from the same source on the same subject favorable to McAllister.[13]

---

[13]     McAllister cites several examples of supposed cherry-picking. (Dkt. No. 10, p. 19). For example, ALJ Staller cited hearing testimony and a treatment progress note that a medication, Gabapentin, helped a lot with McAllister's radicular symptoms (T. 67), but failed to note that same medical record states: "Due to increasing pain and nerve blocks helping minimally, I will refer the patient for a surgical opinion . . . ." (T. 309).

With regard to weighting of subjective evidence, McAllister further argues that ALJ Staller erred in failing to evaluate side effects of his various medications, failing to consider whether McAllister stopped working for medical reasons, and misconstruing evidence regarding McAllister's daily activities.

F.    *Discussion and Analysis*

Absent flagrant disregard of governing law, nothing in social security jurisprudence is more firmly established than that it is the prerogative of the Commissioner, not reviewing courts, to resolve evidentiary conflicts and to appraise credibility of witnesses, including the claimant. *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by administrative adjudicators. *See Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.' ").

A credibility assessment does not become patently unreasonable simply because its articulation fails to reflect formulaic adherence to a specific evaluative protocol prescribed by an implementing regulation or an interpretive ruling. *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) (declining to require "slavish recitation of each and every factor" prescribed by 20 C.F.R. § 404.1527(c) for evaluating medical opinion "where the ALJ's reasoning and adherence to the regulation are clear"); *Judelsohn v. Astrue*, No. 11–CV–388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) ("[f]ailure to expressly consider every factor [404.1529] set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility

are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination."). Current circuit law has evolved to the extent that reviewing courts will affirm administrative decisions when they determine that, notwithstanding embedded technical violations of evaluative protocols, correct principles of law were applied, the decision provides a basis for meaningful judicial review, and substantial evidence supports the determination. *See Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to conduct the function-by-function analysis prescribed in SSR 96-8p is grounds for automatic remand).

Here, ALJ Staller applied correct principles of law. He cited all regulations and rulings that govern residual functional capacity determinations, credibility assessments of medical opinions and credibility assessments of subjective testimony, and described their requirements. (T. 64, 66). This evidenced his awareness of their applicability and his intent to apply them. The factors he actually applied in each credibility assessment case were within the purview of those governing legal principles. For example, consistency with the record as a whole is relevant to assessments of medical opinion, and daily activities and effectiveness of medications are relevant to assessments of subjective testimony.

ALJ Staller's decision provides a basis for meaningful judicial review. He articulated specific rationales for giving limited weight to Dr. Tiso's medical opinions and for discounting McAllister's subjective self-evaluations. *See* Section V.*D.*, *supra*. In each instance, a reviewing court can evaluate whether that rationale is within the realm of reason and whether it is supported by substantial evidence.

The credibility-assessment issue, therefore, boils down to whether substantial evidence supports ALJ Staller's credibility choices. If so, those choices were not patently unreasonable. "Substantial Evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

This evidentiary standard is quite deferential to the Commissioner because its threshold is low. "Substantial evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla." *Richardson*, 402 U.S. at 401. Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299–300 (1939) (cited in Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed.1991)). Thus, evidence is substantial when *any* reasonable mind might accept it even though *most* reasonable minds would not.

1.     Rejection of Treating Physician's Medical Opinions

For reasons argued by McAllister, ALJ Staller's rationale for affording only limited weight to opinions of treating physician Dr. Tiso is weak. It was a stretch to infer that Dr. Tiso's opinions were inconsistent with the objective medical evidence as a whole when no physician other than the a one-time consultative examiner expressed medical opinion regarding McAllister's capacity for work-related activities, nor did any provide diagnostic imaging or

examination findings. The fact that other treating doctors at the same clinic where Dr. Tiso practices (*i.e.,* New York Spine & Wellness Center) at one point recommended aerobic and treadmill exercises to alleviate pain has dubious relevance to McAllister's limitations for engaging in work-related activities on a regular and continuing basis. And, as McAllister emphasizes, ALJ Staller's characterization of his daily activities is skewed in several respects.

That said, Dr. Shirley-Williams's opinions *are* inconsistent with Dr. Tiso's, and they reflect that McAllister is much less severely limited by his impairments. Dr. Shirley-Williams's opinion is based on an examination that occurred *before* the two MRI and nerve conduction tests that reflected positive findings, but well within the period for which disability was alleged, and only about six months prior to Dr. Tiso's report. As such, ALJ Staller was not obliged to reject Dr. Shirley-Williams's report as outdated. Dr. Shirley-Williams used imprecise language when assessing the overall limiting effects of McAllister's impairments as "moderate," but she did make specific findings based on her physical examination.[14] Thus, her opinions were not so vague that ALJ Staller was precluded from given them substantial or greater weight than he afforded to Dr. Tiso's opinions. *See Sweeting v. Colvin*, No. 12–CV–917 (DNH/CFH), 2013 WL 5652501, at *8 (N.D.N.Y. Oct. 15, 2013) (claimant's contention that consultative examiner's use of the term "moderate" in his opinion was vague lacked merit as consultative examiner made specific findings based on physical examination of claimant). In short, ALJ Staller was not legally barred from finding Dr. Shirley-Williams's opinions more consistent with the other medical evidence.

---

[14]   *See* Section V.*B.* and note 10, *supra.*

Treating physicians who recommended exercise clearly did not perceive McAllister as being virtually an invalid, as Dr. Tiso's medical statement infers. Even though they did not assess McAllister's ability to engage in ordinary work activities, their exercise recommendations permitted an inference, however thin, that McAllister is not so limited as to be unable to walk less than a block or stand more than 10 minutes, as opined by Dr. Tiso.

The subjective evidence that ALJ Staller cited as impugning Dr. Tiso's opinions, although considerably skewed in some respects, does not reflect so serious a misunderstanding of McAllister's statements as to raise concern that all relevant evidence was not considered. Even when that evidence is viewed in the context advocated by McAllister, it reflects capacity to engage in physical activities at a greater level than opined by Dr. Tiso in some respects. For example, Dr. Tiso opined that McAllister can walk less than one city block, whereas McAllister testified he can walk two or three. (T. 34).

While ALJ Staller's weighting of medical opinion evidence was at or near the apogee from center of reasonableness, a reviewing court cannot conclude that *no* reasonable mind could accept ALJ Staller's rationale and underlying evidence as plausible and adequate to support his credibility choices. Accordingly, his credibility assessment is supported by substantial evidence, and is not patently unreasonable.

2.    Rejection of Subjective Testimony

McAllister argues that ALJ Staller's finding that his subjective testimony as to  intensity, persistence and limiting effects of his symptoms is not entirely credible is not supported by substantial evidence because ALJ Staller: (1) failed

to evaluate significant side-effects of McAllister's medications; (2) failed to consider possible reasons for McAllister's inconsistent statements as to why he stopped working; and (3) mischaracterized McAllister's daily activities and the ability to perform daily activities does not preclude disability.

### a.    *Medication Side-Effects*

The regulation prescribing an evaluative protocol for assessing credibility of subjective testimony lists "type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms" as one factor to consider.  *See* Section V.*A*.2 and note 6, *supra*.  When assessing McAllister's credibility ALJ Staller relied on evidence that McAllister's medications alleviate his symptoms. (T. 66-67).  McAllister claims, however, that ALJ Staller erred by failing to factor also alleged medication side-effects and pain.  (Dkt. No. 10, p. 22-23).

ALJ Staller expressly acknowledged side effects from Effexor and Buspirone, including loss of concentration and dizziness.  (T. 63).  And, when formulating McAllister's residual functional capacity, he accounted for those effects.  (T. 63-64).  He directed that McAllister should avoid exposure to dangerous moving machinery and unprotected heights.  (T. 64).  Additionally, he limited McAllister to jobs requiring only simple instructions.  (*Id*.).  Thus, there was no error, or, if there were, it did not affect substantial rights.

### b.    *Inconsistent Testimony*

When assessing McAllister's subjective credibility, ALJ Staller noted that McAllister "reportedly stopped working at the end of May 2010 because of pain in his low back.  However, notes in the record show that the [McAllister] stopped working because of 'differences with his boss.' "  (T. 65, 241).

McAllister argues that those differences *"may have"* stemmed from his limitations resulting from pain which caused him to be unable to perform his work. (Dkt. No. 10, p. 22). Beyond this conclusory allegation, however, there is no evidence to support such speculation. Hence, ALJ Staller committed no error when concluding that McAllister gave inconsistent accounts of why he ceased work.

c.    *Activities of Daily Living*

The regulation prescribing an evaluative protocol for assessing credibility of subjective testimony also lists "claimant's daily activities" as one of the factors to consider. *See* Section V.*A*.2 and note 6, *supra*. ALJ Staller noted that despite McAllister's low back pain, he can drive a vehicle at least 30-35 miles, provide daily childcare, dress, bathe, and prepare meals. (T. 65, 67, 241, 246). He enjoys reading, watching television, and listening to the radio. (T. 65, 246).

McAllister argues that ALJ Staller unfairly mischaracterized this evidence. He contends that his testimony also reflected that he does not bathe normally because bending to wash his feet and legs causes pain; he takes longer than normal to do housework, and must consistently take breaks; he experiences pain when dressing, especially when putting on socks and shoes, and begins to hurt after only 15 minutes of driving.

Whether or not ALJ Staller mischaracterized the evidence, his articulated reasons for rejecting McAllister's subjective testimony on the basis of daily activities are unsound for the most part. The fact than a person "enjoys" watching television does not obviously impugn his testimony regarding intensity, persistence and limiting effects of his symptoms. The fact that a person endures

pain to care for and sustain himself with life's basic necessities (dressing, bathing, preparing meals) also is of little or no probative value on that subject.[15]

Were daily-living activities ALJ Staller's sole basis for rejecting McAllister's subjective testimony, McAllister's argument might have merit. But, as described, ALJ Staller factored in other considerations. He cited salutory effectiveness of medications. He relied on objective medical findings (also expressly relevant under the governing regulation). He provided a lengthy summary of medical observations indicating less impairment than alleged. (T. 65-66).

Given his review of the medical evidence, McAllister's acknowledgements that medications alleviate his symptoms, and McAllister's inconsistent testimony, ALJ Staller had more than a scintilla of evidence as a basis for discounting McAllister's subjective testimony irrespective of daily activities.

There is no legal error in ALJ Staller's approach to assessing credibility of McAllister's subjective testimony, and his credibility choice regarding McAllister's self-evaluation of regarding persistence, intensity and limiting effects of his symptoms was not patently unreasonable.

## VI. Capacity to Engage in Alternative Work

ALJ Staller relied on vocational expert testimony when finding that McAllister can perform other work that is available in significant numbers in the

---

[15]     *See, e.g., Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *see also Stoesser v. Commissioner of Soc. Sec.*, No. 08-CV-643 (GLS/VEB), 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011).

national and regional economy.[16]  ALJ Staller asked VE DiStefano to assume hypothetically that an individual can perform light work, but only with additional limitations that ALJ Staller imposed when assessing McAllister's residual functional capacity.   VE DiStefanao identified representative occupations that such an individual can perform.  *See* Section III, *supra.*

McAllister argues that ALJ Staller's finding (that McAllister can perform other jobs) is unsupported by substantial evidence because VE DiStefano's testimony was based on an incomplete hypothetical question.  The premise is that the hypothetical question posed to the vocational expert was incomplete and defective because it did not include all of the limitations that McAllister actually proved.  This, in turn, rendered the vocational expert's testimony unreliable evidence to support a determination that McAllister can perform alternative, available work.

Expert vocational testimony given in response to a hypothetical question that does not present the full extent of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, cannot constitute substantial evidence to support a conclusion of no disability.  *See Pardee v. Astrue*, 631 F. Supp.2d 200, 211-12 (N.D.N.Y. 2009) (citations omitted); *McAuliffe v. Barnhart*, 571 F. Supp.2d 400, 407 (W.D.N.Y. 2008).  To be valid, however, a hypothetical question need not include every limitation claimed or opined by a medical source deemed not credible.  Rather, it must incorporate only limitations that an administrative

---

[16]     When utilizing vocational experts, administrative law judges pose hypothetical questions which must reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the vocation expert's testimony.  *See De Leon v. Secretary of Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984).  When a hypothetical question meets that requirement, and is supported by substantial evidence, expert vocational testimony suffices as substantial evidence supporting a Step 5 finding.  *See Mancuso v. Astrue*, 361 Fed. App'x 176, 179 (2d Cir. 2010) (summary order); *see also Salmini v. Commissioner of Soc. Sec.*, 371 Fed. App'x 109, 114 (2d Cir. 2010) (summary order); *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).

law judge finds credible and which are supported by substantial evidence. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) ("An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion, and it accurately reflects the limitations and capabilities of the claimant involved.") (internal citations and quotations omitted)).

Here, the central premise of McAllister's argument falls under its own weight. McAllister argues that the credibility errors proffered in Points 1 and 2 caused ALJ Staller to find that McAllister has a higher residual functional capacity rating and fewer limitations than the evidence showed. But, as foregoing analysis reveals, ALJ Staller did not make credibility-assessment errors or an invalid residual functional capacity finding. Hence, the suggestion that McAllister's residual functional capacity actually is *less* and his impairment-related limitations are *more* than determined by ALJ Staller is a false premise. ALJ Staller's hypothetical question was not defective simply because it did not factor in more the more severe limitations opined by Dr. Tiso and urged by McAllister who ALJ Staller properly determined to lack credibility.

The hypothetical question actually posed to VE DiStefano exactly matched McAllister's residual functional capacity as determined by ALJ Staller. (T. 36-43). It also factored a person of McAllister's age, education, and work background. (*Id.*). Therefore, ALJ Staller's use of and reliance on VE DiStefano's vocational testimony was appropriate. *See Mancuso v. Astrue*, 361 Fed. App'x 176, 179 (2d Cir. 2010) (summary order) (". . .Commissioner may rely on a vocational expert's testimony . . . so long as . . . hypothetical is based on substantial evidence." (citation omitted)); *see also Salmini v. Commissioner of*

*Soc. Sec.*, 371 Fed. App'x 109, 114 (2d Cir. 2010) (summary order) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.").

## VII.  Recommendation

The Commissioner's decision denying disability-based benefits should be **AFFIRMED**.

## VIII.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the __18__ day of ___October___ 2014.

Earl S. Hines
United States Magistrate Judge